**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GARY W. REESE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **04 C 3637** |
| | ) | |
| **GENERAL ELECTRIC COMPANY,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

Plaintiff Gary Reese contends that his former employer, General Electric Company ("GE"), discriminated against him in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*., by laying him off and failing to transfer him after his position was eliminated. GE's motion for summary judgment is before the court. For the following reasons, GE's motion is granted.

## I.     Background

The following facts are drawn from the parties' Local Rule 56 submissions and are undisputed unless otherwise noted.

### A.     GE's Policies and Procedures

According to GE, it maintains and enforces an equal employment opportunity ("EEO") policy entitled "Fair Employment Practices." This policy requires it to "recruit, hire, train, compensate, promote and provide other conditions of employment without regard to a person's race, color, religion, national origin, sex (including pregnancy), sexual orientation, age, disability, veteran status or other characteristic protected by law."

GE asserts that it uses an internal application procedure through which it posts available positions in a corporate database, and that all GE employees have access to the database. With respect to evaluations, the GE employees complete self-evaluations and are also evaluated by their managers. As part of this process, the employees and their managers establish objectives on an annual basis. The form that encompasses the result of the evaluation is referred to as an

"EMS" form. The EMS form and any statements of career interest contained therein is not a substitute for the posting process.

GE maintains a Special Early Retirement Option ("SERO") policy to benefit eligible employees affected by layoff, plant closing, or other types of job loss. Employees are eligible for SERO if, among other things, they are: (1) subject to a permanent job loss event, such as layoff; (2) are at least age 55 but younger than age 60 on the date of job loss; and (3) have at least 25 years of pension qualification service on the date of job loss.

Employees who elect SERO are treated as regular retirees pursuant to the GE pension and other benefits plans, despite the fact that they otherwise would not be old enough to retire. Accordingly, employees who elect SERO receive: (1) their full earned pension; (2) the supplement of $14 per month for each year of pension benefit service until age 62; (3) a special supplement of $350 per month until age 62, at which time the employee qualifies for reduced social security benefits; (4) benefits based on the employee's Personal and Voluntary Pension Accounts; and (5) the same medical, dental, life insurance, and other benefits that employees who retire at age 60 receive. SERO is an option that eligible employees affected by job loss must elect. An employee who elects SERO effectively retires from GE and, thus, is not considered for available positions after the election.

**B.     Reese's Employment With GE**

**1.     Reese's Positions with GE**

Plaintiff Gary Reese is currently 56 years old. In 1967, GE hired Reese to work at Knolls Power Laboratory as a technician. In 1974, Reese entered GE's technical marketing program and was trained in sales. After completing the program, Reese performed various functions at different divisions within GE. In 1994, GE reorganized the sales force in its Oak Brook office and selected Reese for a sales position. In September of 1994, GE established an industrial account team in order to build relationships with major industrial customers. GE selected Reese to be an industrial account manager.

Between 1996 and 1997, GE focused on globalizing its business and, accordingly, renamed the industrial account manager position "global account manager" ("GAM"). Reese occupied this position for the remainder of his employment with GE, despite subsequent restructuring and account changes. As a GAM, Reese's responsibility was to target global accounts and develop executive-level relationships with Fortune 100 companies with the objective of securing national account purchasing agreements to supply the companies with products for their facilities worldwide. Specifically, Reese's role was to form relationships with the senior executives and managers of the accounts for which he was responsible in the hopes of influencing GE's sales with the account. Field sales employees were responsible for developing relationships with the accounts' local plants.

In 1994, when GE selected Reese to be a GAM, it assigned him to the Baxter, Abbot Labs, Inland Steel, Amoco, and Motorola accounts. In or around 2000, GE identified opportunities for data centers and thus assigned the GAMs to data center customers to learn the business. The data centers were within the telecommunications industry, in which GE sought to become more proactively involved. For several years, Reese was geographically deployed (meaning that he was assigned to a particular geographic region) and his primary accounts were Sprint and Motorola, both of which are in the telecommunications sector.

## 2. GE's Reorganization of Its GAMs From Regional to Target Markets and Reese's Assignment to the Telecommunications Sector

In April of 2002, David Griffith was promoted to General Manager of the Global Accounts Team. When Griffith assumed responsibility for the team, all of the GAMs were geographically deployed. Shortly after Griffith assumed his new position, between April and May of 2002, the Global Accounts Team began discussing ways to reenergize the team and help grow business, and Griffith decided to reorganize the GAMs around target markets, one of which was telecommunications.

In 2002, Sherry Sakagawa, a college student who was a summer intern at GE, conducted a study indicating that there were opportunities in the wireless telecommunications market. GE

did not rely on Sakagawa's report regarding the telecommunications market in deciding to target the sector. Instead, GE already did business with several telecommunications firms and, thus, decided to target telecommunications. According to Reese, GE had Sakagawa create her report to justify GE's planned reorganization, which placed Reese in a position marked for failure.

As early as May 3, 2002, Griffith informed Reese that, pursuant to the reorganization, he was going to be exclusively assigned to GE's telecommunications accounts. Griffith selected Reese for this position because Reese already had been targeting Sprint and Motorola for several years and had been in charge of these accounts. Pursuant to the reorganization, Reese also was assigned the AT&T and MCI WorldCom accounts.

The reorganization of the Global Accounts Team into target markets was completed on October 31, 2002. Well before this, however, in May 2002, Griffith was transitioning Reese and giving him opportunities to increase his knowledge and involvement in the telecommunications sector. Reese believed that the telecommunications industry represented a large opportunity for GE, and testified at his deposition that he was not given a chance to develop the telecommunications market, since he was forced out three months after the effective date of the reorganization.

### 3.     Elimination of Reese's Position

In early 2003, GE's first quarter sales projections were poor. As a result, Michael Pilot, then Vice President of Sales, decided to reduce head count throughout GE's sales departments. Pilot thus told Griffith to eliminate a position from the Global Account Team, but entrusted to Griffith the responsibility to decide which position was appropriate for elimination.

Industry performance was a foremost consideration in Griffith's decision because whichever position was eliminated would not be replaced or absorbed, but instead would be abandoned completely. Thus, the position slated for elimination had to be within an industry that Griffith did not believe would rebound or produce measurable results for GE in 2003 or beyond. Griffith testified at his deposition that "sometime in the middle of April 2003 time frame," he

- 4 -

determined that a business downturn and poor projections in the telecommunications industry made the Telecommunications GAM position a logical choice for elimination. Griffith Dep. at 31. In reaching this decision, Griffith considered the tremendous downturn recently experienced by a business that GE acquired during the telecommunications boom in 2000, as well as general industry business news.

Reese contends that this reason is pretextual, since GE had long known that the telecommunications market was doomed and nevertheless intentionally chose to have Reese focus on this market. The parties agree that the dramatic downturn of business activity in the telecommunications segment occurred over a two year period beginning in 2001. Reese also notes that despite the two-year downturn beginning prior to his assignment to the telecommunications area in the Spring of 2002, GE's answers to his interrogatories claim that the telecommunications industry experienced a business downturn <u>after</u> he was placed in the Telecommunications GAM position.

Griffith asserts that he approached Brad Greene, GE's Human Resources Manager, after learning that he had to reduce headcount in his group. Griffith told Greene that he had slated the Telecommunications GAM position (Reese's job) for elimination because of a downturn in that sector. In response, Greene testified that on or around February 11, 2003 (despite the fact that Griffith testified that he decided to eliminate Reese's position in April of 2003), Greene submitted a SERO request form for Reese to GE headquarters for approval.

The decision to eliminate Reese's position was finalized in April of 2003 when headquarters approved the SERO request. On April 25, 2003, Griffith notified Reese that GE was eliminating his position. Reese received written notification of the decision on April 29, 2003.

Reese disagreed with Griffith's decision to eliminate the Telecommunications GAM position. On May 19, 2003, Reese challenged his layoff and submitted a Level I submission form to GE's alternate dispute resolution ("ADR") program. On July 30, 2003, Reese submitted

a Level III ADR form. GE's decision remained unchanged and Reese's layoff was effective August 1, 2003. GE's original date for Reese's elimination was June 30, 2003, one day before Ian Mathews, who was twenty-six years old, was promoted to a district manager position for which Reese was qualified. Matthew's promotion occurred after Reese presented his grievance over his layoff.

GE did not replace Reese and Reese's duties were not redistributed elsewhere in the sales organization. Since Reese's layoff to the present, no one at GE has performed the functions that the Telecommunications GAM position encompassed. GE did not create any account manager positions following the elimination of Reese's position. Similarly, GE did not identify any new target markets after its elimination of Reese's position. It appears that the position of GAM was eliminated but that the nine other former GAMs remain employed with a division of GE in some capacity. *See* Griffith Dep. at 33-41.

### 4. Reese's Attempts to Secure Another Position and His Election of Early Retirement

Upon notifying Reese of his layoff, Griffith encouraged Reese to seek job opportunities both inside and outside GE. Looking back to Reese's 2002 EMS, under the section entitled "career interests," Reese stated that he wanted to "[c]ontinue as a Global Account Manger leading to a field sales manager position." Reese believes that this statement qualified as an application for a district manager position and put GE on notice that he wanted to remain employed in some capacity with GE. Reese testified that if he knew his position was going to be eliminated, he would have written something different. Moreover, Reese filled out his evaluation on December 26, 2002, well in advance of any knowledge that his position was going to be eliminated.

Reese did not apply for any other positions through GE's internal application process or otherwise apply for any specific senior professional positions that he believes were available at the time he was notified of his layoff. Reese believes that GE discriminated against him by failing to transfer him to a senior professional position. In response to GE's inquiries, however,

Reese stated that he did not affirmatively apply for any specific position and could not identify any positions that were available at the time of his layoff for which he was qualified. He did, however, file a grievance over his layoff. Reese believes that because his position was eliminated and he filed a grievance, Griffith had the responsibility to tell Reese about job openings.

In June 2003, Reese elected early retirement through GE's SERO benefit plan. Specifically, on June 4, 2003, Reese completed and signed a PEN-1 form, which is a Notification of Decision to Retire. On the form, Reese Checked the box electing SERO. After his election, Reese no longer was considered a candidate for available positions.[1]

### C. GE's Business Reorganizations, Hires, And Positions To Which Reese Claims GE Failed To Transfer Him

In June or July of 2003, approximately two to three months after GE eliminated Reese's position, GE reorganized its sales organization.[2] Specifically, Pilot eliminated Griffith's position and appointed three sales leaders to head commercial, industrial, and utility sales. The remaining GAMs were reassigned to one of the three sales managers. Only the reporting structure changed; the GAMs were not placed into new positions, but instead retained the same market segments. No GAM other than Reese lost employment as a result of the reorganization.

---

[1] Reese denies that he retired voluntarily, stating without the benefit of any specific citations to the record that, "GE gave Reese no choice but to fill out a SERO as GE previously set forth in its statement." The court has overlooked several of Reese's denials which do not contain specific citations to the record as the court was able to readily identify the evidence that Reese did not cite. *See, e.g.*, Reese's Response to GE's Rule 56.1 statement at ¶26 (citing to a deposition with no pinpoint cite). The court, however, is not required to scour the record to unearth evidentiary support for a party's position. *See, e.g., Carter v. Am. Oil Co.*, 139 F.3d 1158, 1162 (7th Cir. 1998). Thus, a party who does not properly contest the opposing party's properly supported facts is considered to have admitted those facts. Local Rule 56.1(b)(3); *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1312 (7th Cir. 1995). Because Reese did not provide a citation in support of his denial and none of GE's prior facts seem to relate to, let alone support, the proposition that GE forced Reese to take early retirement, the court will neither accept Reese's claim that he had no choice but to fill out a SERO nor the related inference that GE somehow prevented Reese from formally applying for other positions.

[2] The time frame is inconsistent with Greene's testimony that on or around February 11, 2003, he submitted a SERO request form for Reese to GE headquarters for approval.

In February of 2004, GE Industrial merged with GE Appliances and Lighting. Pilot's position was eliminated and several of the market segments that previously were handled by the defunct GAM position were transferred to GE Energy, a separate GE business. Many of the former GAMs – along with other employees in GE's industrial segment – were reassigned to GE Energy. After this reorganization, the former GAMs (other than Reese) were all still employed.

Reese's complaint alleges that he "was passed over by GE so that GE could place a 26-year-old, less qualified candidate to a position that Reese requested and was qualified for." Cmplt. at ¶ 13. During Reese's deposition, however, he conceded that he was unaware of the district manager position filled in July of 2003 by Ian Mathews, the 26-year-old candidate, until after Mathews had secured the position. He also testified that he "did not apply directly for the position" but instead indirectly applied by noting in his 2002 EMS that his "career interests" were to "[c]ontinue as a Global Account Manger leading to a field sales manager position."

GE contends that Mathews was qualified for the district manager position because in 2000 and 2001, Mathews was elected as the class leader of GE's technical sales leadership program. In addition, in 2001, Mathews was awarded the Managerial Award for Account Growth; in 2002, Mathews was awarded the GE Industrial Systems Top Hunter Award (an award for bringing new business to GE) and the Top Chicago Boundaryless Sales Award; and in 2003, Mathews was awarded GE Industrial Systems 4 E's Top Sales Award, Peak Performers Bermuda Trip, and was GE's Industrial Sales Workout! Champion.[3]

Jim Hibberd, General Manager Industrial Sales, was the decisionmaker regarding the district manager position to which Mathews was promoted.[4] Griffith did not participate in the

_____

[3] Reese has denied the facts in this paragraph "as undisclosed testimony." He has done the same thing with facts discussed below relating to Jim Hibberd. A bald assertion that a discovery violation has occurred, without any substantiating detail or a separate motion which would allow the record to be developed and GE to respond, is not enough to justify striking a portion of GE's facts.

[4] Reese denies the facts relating to Hibberd, stating that GE did not disclose Hibberd. Without some sort of separate motion (*e.g.*, a motion asking the court to strike or not consider

decision to promote Mathews and was never Mathews' manager. The district manager position is different than the now-eliminated GAM position in that district managers provide leadership for a team of salespersons focused on the local industrial market. GAMs, on the other hand, are in an individual contributor role and have no direct reports.

Reese has never been a district manager. However, Reese believes that he was more qualified than Mathews for the district manager position because GE had employed Reese for 36 years and Reese had been a successful employee throughout his career, while Mathews had worked for GE for 4 years (two years of training and two years of outside sales) before his promotion. At his deposition, Reese stated that he believed that GE chose Mathews for the district manager position because Mathews was substantially younger than he was. The basis for this belief was Reese's assessment of his own history, background and experience with GE, contrasted against Mathews' age and Mathews' far more limited career with GE, plus the fact that Reese's supervisors knew that Reese was unhappy about having his position eliminated and yet did not alert him about the district manager position.

When asked to identify the facts supporting his claim that GE's promotion of Mathews to the senior district manager position instead of transferring Reese was age discrimination, Reese testified:

> Q. . . . What facts are you relying upon other than the fact of your age and other than the fact of Mr. Ian Mathews?
>
> A. Well, I don't –
>
> Q. (Continuing) -- age?
>
> A. I don't understand what else it could be.
>
> Q. Okay.
>
> A. I guess I have -- to further that, because I put this in mediation. No one has come back to me and said that this is why. No one has approached me and said this is

the paragraphs relating to Hibberd) detailing GE's alleged discovery delict, to which GE could respond, the court does not know what to make of Reese's denial, except to say that it is not sufficient to allow the court to find that the evidence regarding Hibberd should be barred.

> why we didn't approach you for the opportunity. So General Electric had an opportunity to respond to me, and they chose not to.
>
> Q.    . . . So no one has given you a reason and General Electric didn't approach you. And is that why you're concluding that it must be because of your age?
>
> A.    No. I'm concluding because I was – I was terminated. I was 56-years-old, and Ian Mathews was given the assignment, and I was not given the opportunity to interview, talk to about the assignment and I was just terminated. So, to answer your question, I would believe that would be – I believe I've answered your question.
>
> Q.    . . . So those are the facts you're relying upon?
>
> A.    Yes.

Reese Dep. at 74-75.

Reese alleges in his complaint that GE created several senior professional positions at the time it laid him off. Reese testified during his deposition, however, that he could not identify any specific positions that were available and that he did not apply for any specific positions. He also seems to be asserting that he did not need to apply for a new position since the rest of the GAMs eventually landed in other positions with GE. The record does not indicate whether the other GAMs who were transferred had in fact affirmatively sought to be transfered.

Reese also alleges that "two new Global Account Managers were given assignments that were previously responsibilities of Reese." During his deposition, Reese identified the GAMs to whom he refers as David King and David Orsini.[5] At the time Reese's position was eliminated, King was age 52 and Orsini was age 44. In the Fall of 2002, before Reese's layoff, GE had hired King as the GAM for Oil and Gas, and specifically for GE's Chevron/Texaco account. GE hired King to replace Lisa Pieszak, who transferred to another position within GE. GE hired Orsini as the GAM of Pharmaceuticals in the Summer or Fall of 2002.

---

[5]  Reese asserts that King and Orsini were new hires and had far less seniority than he had, and makes various other arguments, without the benefit of record citations, in response to GE's facts regarding King and Orsini. Since the responses to the facts regarding King and Orsini are not supported by any specific citations to the record, the court will not consider them. *See* Local Rule 56.1(b)(3)(A).

Reese does not contend that he should have been hired for the positions in which King and Orsini were placed. Reese also concedes that King and Orsini were not given account responsibilities that were part of Reese's position at the time of his layoff. Reese did not apply for either King or Orsini's position. Further, Reese was employed by GE at the time GE hired King and Orsini. Reese believes that GE should have terminated King and Orsini instead of Reese because he was more senior than either King or Orsini and disagrees with GE's decision to hire King and Orsini and to then eliminate Reese's position. Reese has not provided citations to any evidence regarding his qualifications – other than pure seniority – compared to King or Orsini's qualifications for King or Orsini's positions.

Before the reorganization of the GAMs by target markets in the Summer and Fall of 2002, Pieszak left her GAM position and became an industrial sales engineer with GE. In his complaint, Reese alleges that Pieszak was reassigned "regional account responsibilities previously handled by Reese." During his deposition, however, Reese testified that he was not asserting that Pieszak was assigned to his former responsibilities. At the time GE eliminated Reese's position, Pieszak was 44 years old. Reese does not believe that he should have been given the position to which Pieszak was reassigned before his layoff. Instead, Reese asserts that he also should have been reassigned at the time of his layoff to an unspecified position.

Reese alleges that in March or April 2003, Dennis Cochran (the Chemical GAM) and Bob Hull (the General Industry GAM) were given additional accounts that were not in their target markets. These additional accounts were not Reese's. After the merger in February of 2004, Cochran transferred to another division of GE (GE Water) and no one currently fulfills his previous GAM functions. At the time GE eliminated Reese's position, Cochran was 48 years old and Hull was 49 years old.

Reese contends that Cochran and Hull's receipt of additional accounts was discriminatory. When asked the basis for this belief, Reese testified as follows:

Q.      . . . Other than disagreeing with how GE allocated additional responsibilities, is there anything else in this paragraph . . . that you believe supports your contention

of age discrimination? I understand that you disagree with the deployment of business assets, and you disagree in how GE assigns its personnel. We've established that. Other than that, what other –

A.    I believe that reflects that there's – they were reflecting age discrimination for the standpoint that I was singled out to be terminated, and they – they weren't in a position to give me the additional accounts that they were questioning for business decisions.

Q.    Other than the fact of your age, which we all agree was 56 at the time, what other facts support your contention that –

A.    I have – that's it.

Reese Dep. at 103, 104.

According to Reese, a "trend" or "pattern" of discrimination resulted in his layoff. Reese Dep. at 56, 57. The "trend" consists of the following: (1) in 2002, a summer intern at GE conducted a study indicating that there were opportunities in the telecommunications market; (2) Reese was successful with his existing accounts in the telecommunications industry at the time the GAMs were reorganized around target markets and, thus, was assigned to that sector; (3) Reese believed that the telecommunications industry was going to be reviewed over a five-year period; and (4) Reese was laid off at age 56, six months after being assigned to the telecommunications position. Based on this "trend," Reese does not see any reason other than age discrimination to which to attribute his layoff.[6]

Reese believes that GE should have given the telecommunications industry an opportunity to turnaround before eliminating his position. In addition, Reese believes that GE automatically should have reassigned Reese when it eliminated his position. Reese Dep. at 92-93 ("I think it's the boss of the manager – his direct manager's responsibility to communicate with that employee about opportunities that surface. And, when there's a reorganization – when you have a reorganization of the company and there are positions of district managers positions that

---

[6] Reese admits these facts but denies "that this is the only basis for [his] claim of age discrimination." Since he does not provide any specifics or any cites to the record, the court declines Reese's invitation to hypothesize specific arguments for him and locate supporting evidence.

the employee is clearly qualified for, he – someone should let him know before – before the – before it's filled).  Reese also testified that he did not know why Griffith did not tell him about available positions.  *See id.* ("My testimony is Dave Griffith didn't [tell me about available positions] . . . . Why he didn't do that you'd have to ask Dave Griffith").[7]

## II.     Discussion

### A.     Standard on a Motion for Summary Judgment

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Moreover, a court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party.  *Valenti v. Qualex, Inc.*, 970 F.2d at 365; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

Thus, in order to withstand a motion for summary judgment, the nonmoving party must show that a dispute about a "genuine" material fact exists; that is, the evidence is such that a reasonable jury could render a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.  The nonmoving party may not merely rest upon the allegations or details in his pleading, but instead, must set forth specific facts showing that there is a genuine issue for trial. *See id.*; *Celotex Corp. v. Catrett*, 477 U.S. at 322.

The determination as to what facts are "material" in employment discrimination cases depends upon the substantive law of employment discrimination, and the burden of proof

---

[7]  Reese asserts that GE told other employees, including Orsini and King, about new positions at a time when GE claims it had to cut personnel to save costs.  As with prior responses to GE's facts, this assertion is not supported by any citation to the record so the court will not consider it for the purposes of GE's motion for summary judgment.

applicable under the law. *Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 922 (1988). When considering motions for summary judgment in discrimination cases, the court applies these criteria with added rigor because the matters of intent and credibility are crucial issues. *See Sarsha v. Sears, Roebuck, & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).

**B.      Reese's Claims**

Reese claims that GE violated the ADEA by basing its decisions regarding his termination and transfer on his age and seeks to establish discrimination using the well-known *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas v. Green*, 411 U.S. 792, 802-05 (1973). Because Reese's problems stemmed from the fact that GE eliminated his position, Reese's termination was a part of a reduction in force ("RIF"). A RIF occurs when an employer permanently eliminates a position from its workforce. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 694 (7th Cir. 2000). To prove discrimination in a RIF, Reese must, among other things, point to evidence showing that GE treated similarly situated younger employees more favorably than it treated him. *See id.* To establish a prima facie case for his failure to transfer claim, he must establish that: (1) he is a member of the protected class (age 40 or over); (2) he applied for and was qualified for the position sought; (3) he was rejected for the position; and (4) a younger individual received the position. *See. e.g., Rabinovitz v. Pena*, 89 F.3d 482, 486 (7th Cir. 1996).

By establishing a prima facie case, Reese creates a presumption of age-based discrimination and shifts the burden of proof to GE, which then must rebut the presumption by articulating a legitimate non-discriminatory basis for its employment decisions. *Oxman v. WLS-TV*, 846 F.2d at 453. If GE carries its burden, Reese then must persuade the court that GE's proffered reason for its adverse employment decisions was pretextual and that the actual reason for that action was his age. *See id.* Success on this front means that Reese is entitled to proceed to trial. *See, e.g., Hoffman v. MCA, Inc.,* 144 F.3d 1117, 1123 (7th Cir. 1998).

Reese can establish pretext by pointing to direct or circumstantial evidence indicating that GE's decisions were motivated by discriminatory animus or are "unworthy of credence." *Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1145 (7th Cir. 1994). Suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in a protected group, and other "bits and pieces from which an inference of discriminatory intent might be drawn" can support a claim of pretext. *Troupe v. May Dep't Stores Co.,* 20 F.3d 734 (7th Cir. 1994). In addition, "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic on which an employer is forbidden to base a difference in treatment, received systematically better treatment" and "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason is unworthy of belief, a mere pretext for discrimination" can support a claim of pretext. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-08 (1993). With these standards in mind, the court turns to GE's motion for summary judgment.

### 1.    Elimination of Reese's Position

GE contends that Reese has failed to establish a prima facie case because he has not identified a similarly-situated younger employee who was treated more favorably. According to Reese, David King, David Orsini, Lisa Pieszak, Bob Hull, Dennis Cochran, and Ian Mathews were retained, reassigned, or rehired and are outside the protected class or are substantially younger. In Reese's responses to GE's statements of facts, he does not deny that King, Hull and Cochran (who were 52, 49, and 48, respectively, in April of 2003) are not substantially younger because they are less than ten years younger than he is. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 619 (7th Cir. 2000) ("substantially younger" under the ADEA means "at least ten years younger than the plaintiff"). This leaves Orsini, Pieszak, and Mathews.

To be similarly situated, employees must have comparable "qualifications, experience, skills, or abilities." *Balderston v. Fairbanks Morse Engine Div. of Coltec Industries*, 328 F.3d

309, 322 (7th Cir. 2003). Orsini was the GAM for pharmaceuticals, Pieszak was the GAM for Oil and Gas and later was an industrial sales engineer, and Mathews was a salesperson who was promoted to a position that required him to lead a team of salespersons focused on the local industrial market. The court first considers whether Reese should have been given Orsini or Pieszak's positions, as prior to the telecommunications GAM position, Reese was deployed to cover the oil and gas markets and the pharmaceutical market, as well as the telecommunications market.

Reese does not provide any specifics as to his precise qualifications, experience, skills, or abilities or Orsini and Pieszak's qualifications, experience, skills, or abilities. Thus, he does not and cannot compare his qualifications, experience, skills, or abilities to Orsini and Pieszak's. The fact that Reese had some level of experience in the oil and gas markets and the pharmaceutical market and GE later selected Orsini and Pieszak to cover these markets and selected Reese – who also had expertise in the telecommunications market – to cover telecommunications is not enough to show that Reese was similarly situated to Orsini or Pieszak. *See id.* (similarly situated employees must possess "analogous attributes, experience, education, and qualifications relevant to the positions sought"). Reese thus cannot create a fact question as to whether GE put him into the telecommunications GAM spot in order to set him up, as opposed to moving him to the oil/gas or the pharmaceutical GAM spots since nothing in the record indicates that he and Orsini and Pieszak were equally qualified to take the oil/gas or the pharmaceutical GAM positions.

And with respect to Mathews, all the court knows is that Reese had substantially more work experience than Mathews. Putting aside the fact that Reese did not apply for the position that Mathews obtained, the court does not know how Reese's and Mathews' specific backgrounds compare in terms of suitability for the position that Mathews obtained. The fact that Reese had many more years of experience with GE, without more, does not show that Reese and Mathews were similarly situated. *See id.*

The court also notes that Mathews did not replace Reese and GE did not spread Reese's responsibilities to other employees. Instead, it point blank eliminated his position as part of its plan to abandon its prior focus on the telecommunications market. Reese appears to be contending that GE discriminated against him based on his age because at the end of the restructuring, Mathews was employed and he was not, and he could have done the duties required by Mathews' position. As noted above, however, this argument is speculative. Moreover, Hibberd made the decision to promote Mathews and the record is clear that Hibberd did not know that Reese was interested in the position that Mathews ultimately obtained. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d at 618 ("[a] demonstration of substantial similarity would also require a showing that a common supervisor offered one of these other employees a position for which [plaintiff] was qualified and that this same supervisor also knew about [plaintiff's] availability"). For these reasons, the court finds that Reese has failed to make out a prima facie case of age discrimination with respect to the elimination of his position. Accordingly, the court will not consider GE's remaining arguments.

### 2.    GE's Failure to Transfer Reese to Another Position

Reese and GE disagree as to whether he applied for a position after the RIF that eliminated his job and the consequences of the fact that Reese elected to take early retirement. The court begins at the beginning – whether Reese has satisfied his burden of establishing a prima facie case of age discrimination. As with his claim based on the elimination of the telecommunications GAM position, the similarly situated requirement is his downfall. The record shows that none of the allegedly similar employees, regardless of their age, were transferred in lieu of layoff at approximately the same time that Reese's position was eliminated. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d at 618 (comparable employees must be subject to a RIF and have a common supervisor who offered the comparable employee a position for which the plaintiff was qualified, knowing about the plaintiff's availability).

With respect to King and Orsini, before Reese's layoff (specifically, in the Fall of 2002), GE hired King as the GAM for Oil and Gas to cover GE's Chevron/Texaco account and to replace Pieszak, who had transferred to another position within GE. GE hired Orsini to be the Pharmaceuticals GAM in the Summer or Fall of 2002. As discussed more fully in the facts section above, Reese did not assert that GE should have hired him for the positions in which King and Orsini were placed, King and Orsini were not given responsibilities that were part of Reese's position at the time of his layoff, Reese did not apply for either King or Orsini's position, and Reese was employed by GE at the time GE hired King and Orsini. These facts do not establish that King and Orsini's positions were open at the time that Reese needed to find a new position and that Reese applied but was passed over in favor of a similarly situated younger employee.

With respect to Hull and Cochran, in March or April 2003, Cochran (the Chemical GAM, who was 48 years old) and Hull (the General Industry GAM, who was 49) were given additional accounts that were not in their target markets and which were not Reese's accounts. First and foremost, neither Hull nor Cochran is substantially younger than Reese. Moreover, the basis for Reese's belief that Cochran and Hull's receipt of additional accounts was discriminatory was that Reese was the oldest of the three employees. *See* Reese Dep. at 103-04 (Q: "Other than the fact of your age, which we all agree was 56 at the time, what other facts support your contention that –" A: "I have – that's it"). This is clearly insufficient to show that Reese, Cochran, and Hull were similarly situated and that he applied for and was qualified for Cochran, and Hull's positions. *See Rabinovitz v. Pena*, 89 F.3d at 486.

Turning to Pieszak, Reese testified that he did not believe that GE should have given him the position that it had assigned to Pieszak before Reese's layoff. Instead, Reese asserted that he also should have been reassigned at the time of his layoff to an unspecified position. Among other things, this argument fails to show that Reese applied for and was qualified for

Pieszak's position, or that Reese applied for a specific position and that GE hired a similarly situated and substantially younger employee for that position. *See id.*

This leaves Mathews. Reese's claim that he applied for Mathew's position is based on his 2002 EMS, which stated under the section entitled "career interests" that Reese wanted to "[c]ontinue as a Global Account Manger leading to a field sales manager position." In no way, shape, or form could this statement be construed as an application for a different, specific position within GE, let alone one that may not have even existed at the time of the 2002 EMS (Mathews was promoted to a district manager position in June of 2003). *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000)(to demonstrate that a failure to transfer was discriminatory, "an employee must do more than show a general interest in obtaining some job" and thus must establish that he "was qualified for and applied for specific jobs that were available during the RIF").

The fact that Reese grieved the elimination of his position also is not enough to put Griffith on notice that Reese wanted a position that was not controlled by Griffith. Knowing that an employee is dissatisfied with the elimination of his position does not equate to knowledge that an employee wishes to apply for an unrelated position in a large enterprise which maintains a system of job postings so that employees can apply for a desired job for which they think they are qualified. This is especially true given that "the ADEA does not mandate that employers establish an interdepartmental transfer program during the course of a RIF; an employer incurs no duty to transfer an employee to another position when it reduces its workforce for economic reasons." *Taylor v. Canteen Corp.*, 69 F.3d 773, 780 (7th Cir.1995).

Reese's citation to *Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675 (7th Cir. 2003), does not alter this conclusion. According to Reese, *Zaccagnini* stands for the proposition that an employee who files a grievance is tantamount to an application for available jobs. In *Zaccagnini*, however, the plaintiff was a driver who filed a grievance more than a month

before the defendant filled its last driver position, and the plaintiff's grievance asserted that he felt he should be next to be rehired, and the plaintiff met with management and discussed the plaintiff's desire to be rehired. In contrast, in this case, Reese grieved the elimination of his position, and has not pointed to any evidence showing that he told GE that he wanted the job that Mathews obtained. Indeed, Reese could not have applied for this position, since he testified that he did not know about it until after the position was filled. Under these circumstances, the court finds that Reese's grievance fails to satisfy his burden of showing that he applied for Mathews' position.

Reese's final argument is that GE gave changing reasons for the RIF: first, the failing market, then his negative performance, then the fact that he did not request a transfer and instead elected to take early retirement. This is essentially a pretext argument, which is not properly before the court because Reese has failed to establish a prima facie case of discrimination with respect to GE's failure to transfer him when it eliminated his GAM position. In any event, as noted by GE, Reese has not pointed to any concrete evidence suggesting that GE's reliance on Reese's election of early retirement and his failure to apply for other positions was not the actual reason that GE did not try to transfer him to another position. *See Balderston v. Fairbanks Morse Engine Div. of Coltec Industries*, 328 F.3d at 323-24 (the court should consider whether an employer honestly believed its reason for making an employment decision, not whether the decision was right or wrong).

GE's position makes sense, as Reese agrees that upon notifying him of his layoff, Griffith encouraged him to seek job opportunities both inside and outside GE. In addition, SERO is an elected benefit, and Reese does not rely on any evidence showing that GE forced him to take it. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1062 (7th Cir. 2003) ("the plaintiffs' argument that [the defendant] engaged in age discrimination simply by offering some of its older workers early retirement packages is a nonstarter" because "an offer of incentives to retire early is a benefit to the recipient, not a sign of discrimination"). It would be very unfortunate if

Reese genuinely but incorrectly believed that GE was obligated to find him another position without the need for him to apply for that position, and thus elected to retire when GE did not come forward with an alternate job for him after it eliminated his position. If this is what happened, however, Reese and not GE must bear the consequences of Reese's misplaced reliance on GE in terms of finding him a new job.

In sum, the court is sympathetic to Reese's predicament. He was an experienced employee with a long history with GE, and GE eliminated his position and did not volunteer to find him another job and thus chose not to go beyond what the law required of it. Unfortunately for Reese, however, employers are not required to follow the rule of "first in, last out" when making employment decisions. That rule is essentially at the heart of Reese's opposition to GE's motion for summary judgment as the essence of his response is that GE discriminated against him because the position it chose to eliminate (Reese's position) was held by the oldest GAM (Reese). But, as discussed above, that is not the law, and the individuals that Reese focuses on with respect to his failure to transfer claim were not similarly situated to him and he did not apply for any other jobs. *See Cerutti v. BASF Corp.*, 349 F.3d at 1062 (the ADEA was not enacted to immunize older employees from being terminated for legitimate reasons and thus cannot be used to protect them "from the often harsh economic realities of common business decisions and the hardships associated with corporate reorganizations, downsizing, plant closings and relocations"). GE is, therefore, entitled to summary judgment as to Reese's failure to transfer claim.

## III.  Conclusion

For the above reasons, GE's motion for summary judgment [36-1] is granted. The clerk is directed to enter a Rule 58 judgment and to terminate this case.

DATE:   August 22, 2005

*Blanche M. Manning*
Blanche M. Manning
United States District Judge